## In re CHAMPION OIL COMPANY, Debtor.

### Bankruptcy No. 1–79–02176.

United States Bankruptcy Court, S. D. Ohio, W. D.

Dec. 29, 1980.

Joseph W. Nienaber, Cincinnati, Ohio, for debtor-in-possession.

Kevin McNamara, Cincinnati, Ohio, for Atlantic Richfield.

## DECISION ON CONFIRMATION.

BURTON PERLMAN, Bankruptcy Judge.

Debtor filed a petition seeking relief under Chapter 11 of the Bankruptcy Code in this Court on November 27, 1979. Debtor filed a Plan of Arrangement. A hearing on confirmation of such plan was held November 26, 1980. At the hearing Atlantic Richfield Corporation appeared for the purpose of opposing confirmation, as did also creditors Deal Petroleum Co. and Middletown Oil Co. (Middletown Oil is a company of which the principal is Scoby Ratliff). Atlantic Richfield, Deal Petroleum, and Scoby Ratliff are secured creditors of the debtor. At the hearing evidence was presented by the debtor and also by the secured creditors. We reserved decision at the conclusion of the hearing on confirmation.

On October 17, 1978, shortly after the Butler County Common Pleas Court had ordered real estate of the debtor sold in foreclosure, debtor filed a petition under Chapter XI of the Bankruptcy Act, at Dayton, Ohio. A Plan of Arrangement was filed in that case. The case, however, was dismissed on May 16, 1979, "for failure of Debtor to make deposit required." Following dismissal of the Chapter XI proceeding in Dayton, foreclosure proceedings once again were initiated by secured creditors, and a foreclosure sale was set for December 6, 1979. It seems clear that the Chapter 11 filing in this Court on November 27, 1979 had for its purpose the thwarting of the second foreclosure sale.

Secured creditors moved to dismiss the Chapter 11 filed in this Court. It was our position that the case should be dismissed unless the debtor could show us that there had been a change in circumstances since the dismissal in Dayton. We denied the motion to dismiss on condition that debtor pay the secured creditors their out-of-pock-

et expenses for delay of the foreclosure suit. Further, we declined dismissal at that time because debtor then indicated that it was negotiating for the acquisition of a refinery which would alleviate the shortage of product for sale which it was experiencing. We learned in early January, 1980 that acquisition of the refinery had fallen through, and we therefore set the matter for further hearing. Further hearing was then held January 23, 1980. At that hearing, debtor offered testimony in support of its position that it was involved in efforts to secure additional allocation of product from the Department of Energy. In addition, debtor offered the testimony of James Megginson of Columbia Oil Co., whose testimony we regarded as very significant. Mr. Megginson testified that he was prepared to underwrite a letter of credit for debtor in the amount of $300,000. This was regarded as significant in view of the dismissal of the prior Chapter XI filing in Dayton for failure to make the requisite deposit, and our belief that debtor should be required to show a change in circumstances in order to avoid dismissal. Following the January 23, 1980 hearing, we denied the motion to dismiss.

The case then proceeded, and on April 28, 1980, a Plan of Arrangement was filed, followed by an amended Plan of Arrangement filed September 4, 1980. It is the amended Plan of Arrangement which was the subject of the hearing on confirmation.

The amended plan is brief. Article 1 states that the costs and expenses of the proceedings are to be paid in cash in full upon confirmation. Article 2 divides debts into four classes. The first class consists of priority claims. The second class consists of creditors having mortgages. The third class consists of creditors having judgments. The fourth class consists of unsecured creditors. Payment is to be made to creditors in Class 1 at the rate of 25% each year for the first four years. No payment is to be made to creditors in Class 2, 3 or 4 until the third year, at which time a payment of 5% will be made, followed by an additional 5% in the fourth year, with further staged payments in each year until the tenth year.

Unsecured creditors, those comprising Class 4, have accepted the plan by the required number and amount. The creditors in Classes 2 and 3 have not accepted the plan. Debtor stated at the confirmation hearing that the Class 1 creditors had accepted the plan.

At the hearing, Scoby Ratliff was called to testify for the objecting creditors. He said that nationally 7–8% less gas has been consumed within the last couple of years because of its high price. He testified further that at present his usual profit is 4 cents per gallon and this is not economic. He testified that presently gas supplies are abundant and the market is highly competitive so that it is very difficult to be viable economically. He offered the opinion that debtor would be unable to make its payments under the plan. Objecting creditors also called Glenn E. Douglass, president of debtor, as on cross-examination. He confirmed what has already been a matter of record in this case, that the address given as the corporate headquarters of debtor actually is its attorney's office in the American Building.

Debtor then called Megginson to testify. Megginson testified that it is true that presently there is a glut in supply and that profit margins are tight. Dealerships can be profitable if the dealers hustle. While gas sales are down nationally, he says that his sales are up substantially and that he expects to sell more next year. Further, he expects that there will be decontrol, and it will not be necessary to secure allocations from the Department of Energy. (The purpose of this testimony doubtless was to defuse the statement of Douglass at a hearing held February 6, 1980. At that time Douglass agreed that if it were not possible to be authorized by the Department of Energy for a greater allocation, debtor would have no hope of rehabilitation. Since then, debtor has been unsuccessful in getting an increased DOE allocation.) He testified that he believed that the plan was realistic. He testified further that the relationship between his company, Columbia Oil, and

Champion Oil is that of seller and purchaser. He stated that he is willing to sell to debtor on credit so long as payments are made within 15 or 16 days, but if payment was not made within this period he would stop selling to debtor. He expressly disavowed that he had undertaken any commitment other than that of selling on credit to debtor, and made it clear that he is not a source of funding for debtor, contrary to his testimony at the hearing on January 23, 1980. Finally, debtor called Douglass to testify in its behalf. He testified that he currently sells from seven to eight hundred thousand gallons per year and from one to one and one half million gallons of heating oil per year. He believes that he can sell 6 million gallons of gas per year at a profit margin no less than 5 cents per gallon. He would sell the increased amount through the 12 stations which he has which are now leased. Because of his fixed costs which then would be spread over a larger base, his operation would be more profitable. On cross-examination it developed that in 1975 and 1976 debtor had had 12 stations open and had then sold in the vicinity of 6 million gallons, but at that time his operation was not profitable. Indeed, it then lost money. It further transpired, that debtor will be operating through leased stations, and none of the leases will contain a requirement that the lessee purchase gas from debtor.

We deny confirmation of debtor's plan for the following reasons. An analysis of the plan proposed together with the accompanying financial background of which we are made aware by the record in this case, indicates that debtor in no way contemplates a change in its mode of operations. No infusion of capital is to occur. Debtor believes, notwithstanding the unfortunate history of the enterprise, that it will somehow become viable, by simply continuing its present operation. Not only does debtor contend that it will be profitable enough to sustain its current operation, but it contends that it will be so successful that it will be able to pay off the creditors who have been held at bay by the present filing in the bankruptcy court. The history of debtor yields not the slightest reason to believe that this will happen. We cannot permit this court to be used for the frustration of creditors when there is no hope of rehabilitation. We conclude that there is not compliance with 11 U.S.C. § 1129(a)(11), the portion of the Bankruptcy Code which imposes upon this court the duty of determining whether a plan is feasible. The Code there requires that:

"(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

We are firmly of the belief that either liquidation or a need for further financial reorganization will occur notwithstanding confirmation of this plan.

In addition, we decline confirmation of the plan because there has not been compliance with 11 U.S.C. § 1129(a)(3). This provision of the statute requires that the plan have been proposed in good faith. In the surrounding circumstances of a filing in Cincinnati giving as the corporate address the office address of counsel, following dismissal of a Chapter XI case in Dayton before another Bankruptcy Judge, and further in view of the suggestion to this court that additional capital was available when that was not the case, there is indicated to us an absence of good faith in the proposal of the present plan.

Further, the plan proposed is totally inadequate in making any showing that the plan "is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." It is not disputed that the Class II and III creditors, those having mortgages and judgments, have rejected the plan. The interest of these classes are impaired under the plan. It is indispensable, therefore, that it be shown, as a condition of confirmation, that the plan is fair and equitable as to these classes. 11 U.S.C. § 1129(b)(1). Debtor makes no offering whatever to sustain this burden.

Pursuant to 11 U.S.C. § 1112(b), the case will be dismissed, since it is our conclusion that it is in the best interests of creditors and of the estate that this be the disposition of the case. Particularly do we base this conclusion on the grounds stated at § 1112(b)(1) and (2), that there is

"(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

(2) inability to effectuate a plan;".

This Chapter 11 proceeding will be dismissed.